## HARRIS vs. THE STATE.

1. CRIMINAL PRACTICE: *Polling the jury.*
    The object in polling the jury is to ascertain if the verdict announced by the foreman is the verdict of all the jurors; and if there is any reason to doubt that all the jurors concur, it is competent for the court, of its own motion, to cause the jury to be polled.

2. VERDICT.
    Where the instructions do not appear in the transcript, and the court below refused to set the verdict aside, the presumption is that it was in accordance with the instructions.

3. ————; *Same.*
    When the jury find the accused guilty, on circumstantial evidence, this court will not disturb the verdict, if there is any evidence to sustain it.

APPEAL from *Drew* Circuit Court.

Hon. T. F. SORRELLS, Circuit Judge.

*Hughes*, Attorney General, for the State.

ENGLISH, CH. J.:

The appellant, Henry Harris, was indicted, tried and found guilty of murder in the first degree, at the August term, 1876, of the Circuit Court of Drew County. He filed a motion for a new trial, which was overruled, and he took a bill of exceptions, setting out the evidence introduced on the trial. He was sentenced to be hung, and an appeal was allowed him by one of the judges of this court.

The third, fourth and fifth grounds assigned in the motion for a new trial may be considered together. They follow:

"*Third*—Because the jury did not return a verdict for the degree of murder for which they found the defendant guilty.

"*Fourth*—Because the jury were polled to ascertain the degree of murder.

"*Fifth*—Because the verdict does not state the degree of murder for which the jury found the defendant guilty."

So much of the record entry of the trial and verdict as relates to these assignments, is as follows:

"After hearing all the evidence adduced, the argument of counsel and the charge of the court, the jury retired in charge of a sworn officer to consider of their verdict, and afterward returned into court the following verdict, viz.: 'We, the jury, find the defendant guilty of murder in the first degree, as charged in the within indictment. F. V. Henderson, Foreman.'"

The same verdict appears to have been endorsed upon the indictment.

It is manifest, from the transcript of the record before us, that there is no foundation in fact, for the third and fifth assignments.

As to the fourth, it appears from the bill of exceptions that, after the verdict, as above, was announced in court, in the presence of the prisoner, the court, of its own motion, polled the jury to ascertain if that was their verdict, and each one answered, "it is."

The object of polling the jury is to ascertain whether the verdict, rendered by the foreman in behalf of himself and the rest, is really concurred in by the others. Colby Cr. L., 385; *State* v. *John*, 8 Iredell L., 339.

Sir Matthew Hale says: "Now, touching the giving up of their verdict, if the jury say they are agreed, the court may examine them by the poll, and if, in truth, they are not agreed,

they are finable.    If the jurors, by mistake or partiality, give their verdict in court, yet they may rectify their verdict before it is recorded, or, by the advice of the court, go together again and consider better of it, and alter what they have delivered.    But if the verdict be recorded, they cannot retract nor alter it."    2 Hale's Pleas of the Crown, 301.

In *Watts* v. *Brains* (on an appeal of the wife for the murder of her husband), Croke Elizabeth, 779, there is this report: "The jury going from the bar, notwithstanding the evidence was pregnant against the defendant, eight of them agreed to find him not guilty ; but the other four withstood them, and would not find it but to be murder.    On the next day morning, two of the four agreed with the eight, to find him not guilty, and afterwards the other two consented in this manner, that they should bring in and offer their verdict not guilty ; and if the court disliked thereof, that then they all should change the verdict and find him guilty.    Upon this agreement they came to the bar, and the foreman announced the verdict, that the defendant was not guilty. The court, much misliking thereof, being contrary to their direction, examined every one of them by the poll, whether that was his verdict, and ten of the first part of the pannel severally affirmed their verdict, that the defendant was not guilty ; but the two last affirmed how they agreed, and discovered the whole manner of their agreement ; whereupon they were sent back again, and returned and found the defendant guilty."

By statute :    "Upon a verdict being rendered, the jury may be polled at the instance of either party, which consists of the clerk or judge asking each juror if it is his verdict, and if one answers in the negative, the verdict cannot be received." Gantt's Digest, sec. 1967.

But this statute does not deprive the court of the authority to cause the jury to be polled if it has reason to doubt that all of the jurors have consented to the verdict announced by the foreman.

In this case, the appellant could not possibly have been prejudiced by the action of the court in causing the jury to be polled. The former had announced the verdict of guilty of murder in the first degree. It turned out, upon the polling, that all of the jurors agreed to this verdict. If any juror had answered in the negative, the verdict could not have been received, but the jury would have been sent out to consider further of their verdict.

The second assignment: " Because the verdict is contrary to the instructions of the court."

It appears from the bill of exceptions, that the court gave instructions asked by the State, and others moved for the prisoner, and charged the jury on the law applicable to the case, but the instructions and charge are not in the bill of exceptions, nor in the transcript before us. We have, therefore, no means of determining whether the verdict was contrary to the instructions of the court or not. The presumption is, that the verdict was in accordance with the instructions of the court, as nothing contrary appears, and the court refused to set it aside on the motion for new trial.

The first assignment: " Because the verdict is contrary to the evidence."

The appellant was charged with the murder of Adam Pippin. The indictment alleges, in the usual form, the time of the offense, 9th of August, 1876, the venue, Drew County, and the manner of the killing, by shooting with a double-barrel shot gun, loaded with powder, leaden balls, etc., etc.

The *corpus delicti* was proven by direct testimony.

It appears that Adam Pippin lived in a cabin on the premises of William Nichols in Drew County. On Wednesday night, of August the 9th, 1876, about eight or nine o'clock, while sitting in his house, he was shot with a gun, through a crack in the wall, near the chimney, and instantly killed, in the presence of his

wife and some of his children. The night was dark and rainy, but after supper he had kindled a light in the fire-place, and after playing awhile with a child, handed it to his wife, "and turned himself in his chair to rest," and while thus resting he was shot. The coroner found five balls in the left side of his head and face.

No witness saw who fired the gun. It was a secret, cowardly and brutal murder.

The jury found, from circumstances proven on the trial, that the appellant was the guilty agent of the crime, and the judge who presided at the trial, and heard all the evidence, refused to set aside the verdict.

There was some evidence of ill feeling between appellant and deceased. It seems that in January, 1876, appellant took the daughter of deceased, ran off with her, and brought her back in the following July, and was living with her at the house of Elias Nelson, in the neighborhood of her father, at the time he was murdered, but had not married her; and her father had, perhaps, forbidden him to come on his place.

It is probable that the jury found in this ill feeling between appellant and deceased a motive, on the part of the former, for the commission of the crime.

It was proven that, a few days before Pippin was killed, appellant was in company of several persons, who were saying that one Rowlett intended to have Adam Pippin up at court for taking his corn, and turning stock on his wheat, when appellant said, "that Adam Pippin could not live until court; that he was too mean a man."

The jury doubtless regarded this as a threat, and as an indication of malice, on the part of appellant, against Pippin.

It was proven that, on Tuesday morning, the day before the killing, appellant borrowed a double-barrel shot gun of Joseph

Young, who lived not far from the house of Elias Nelson, where appellant lived. The gun was loaded and the locks rusty. On the same day, a witness was at the house of Elias Nelson, and helped appellant clean up the gun. Appellant said he was going a hunting, and asked for powder and buck shot to load the gun. Witness told him that buck shot would not do to hunt squirrels, and appellant replied that he wanted to kill them. Witness let him have powder, but had no buck shot. He went hunting (another witness stated) about four o'clock of the evening of the same day, and returned about night, without killing anything. He remained at Nelson's next day (Wednesday, 9th August) until half an hour to sundown, when he went out alone with the gun, saying he was going hunting. Late on the same evening he was seen, by another witness, with a gun on his shoulder, going in the direction of the place where Adam Pippin lived. There was something in his appearance, or movements, that made the witness feel a little frightened. About eight or nine o'clock of that night, a neighbor of Pippin's heard a gun fire, and, shortly after, two of Pippin's children came for him, saying their father had been shot, etc. Appellant returned to the house of Nelson, with the gun, about midnight. His clothes were wet. On being asked by the woman with whom he slept why his shirt was so wet, he said he had passed through a cornfield, and the dew had wet his shirt. Next morning (Thursday) about or a little after daybreak, he got up, and took the gun home to Young. When he borrowed it, it was loaded up to four fingers, to use the language of Young, and when brought back, it had been fired off, cleaned up, and the locks greased. It was loaded when returned, but the loads measured only three fingers.

The house of a witness (Thomas Varnishce) was situated between that of Joseph Young and that of Elias Nelson, about a hundred yards from the latter, and a quarter of a mile from the

former. A little after daylight, on Thursday morning (the morning after the killing) witness saw appellant pass his house, carrying home Young's gun. After he passed, two men came riding by, and one of them stopped and told witness that Adam Pippin was dead; that some one shot him sitting in his house last night. After this man left, in a short time appellant came along, returning from Young's, and told witness the same thing; and asked witness to tell Young, if anybody asked him when he (appellant) "carried his double-barrel shot gun home, to tell them that he carried it home two days ago;" and told witness to say that he persuaded him (appellant) to stay all night (the night of the killing) with him, as he had something important to tell him next morning; and that if anybody asked where he was, to say that he had gone to the Ouachita River hunting. Appellant did not, in fact, stay with witness the night of the killing.

This evidence, that appellant attempted to induce others to utter falsehoods in his behalf, in relation to the time when the gun was taken home, and the place where he stayed on the night of the killing, no doubt made an unfavorable impression on the minds of the jurors as to the innocence of the appellant.

The evidence indicates that, from the morning of the 10th of August (the day after the murder), the appellant attempted to conceal himself. He was found and arrested, a few days before the trial, in a house situated in a thicket, which the witness stated to be a good place to hide in. When found, he was lying on the floor asleep, his head resting upon an open Bible. He had three pistols, an open knife, and a gun was standing in a corner of the house. His shoes were out near the woods, in the weeds.

His surroundings, when found and arrested, were not such as to make a favorable impression on the jury.

Other circumstances were in evidence which may have had some influence on the jury, but it is not deemed material to state

them. We have stated, in substance, the striking features, as presented in the bill of exceptions.

Whether, upon the circumstances disclosed by all of the evidence, we would have found the appellant guilty had we been of the jury, we need not state. It was the province of the jury to weigh the facts and circumstances proven before them, and to pass upon the guilt or innocence of accused. They found him guilty, and we cannot affirm that there was no evidence to support the verdict.

The judgment must be affirmed, and the day fixed by the court below for the execution of appellant having transpired, the affirmance must be certified to the Governor, that he may fix another day for the execution of the sentence.